UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

AVIANCA HOLDINGS S.A., et al.,

                            Debtors.
----------------------------------------------------------X
UDI BARUCH GUINDI, DAVID BARUCH,
SOSHANA BARUCH, HABIB MANN,
GOLAN LP AND ISAAK BARUCH,

                        Appellants,

        -against-

AVIANCA HOLDINGS S.A., et al.,

                        Appellees.

----------------------------------------------------------X

Chapter 11
Case No. 20-11133(MG)
(Jointly Administered)

CIVIL ACTION NO.
1:21-CV-10118-UA

**Oral Argument Requested**

## BRIEF FOR APPELLANTS IN SUPPORT OF THEIR APPEAL OF THE BANKRUPTCY COURT'S ORDER CONFIRMING DEBTORS AVIANCA HOLDINGS S.A., ET AL.'S CHAPTER 11 PLAN

Glen Lenihan, Esq.
OVED & OVED LLP
*Attorneys for Appellants*
401 Greenwich Street
New York, New York 10013

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ..............................................1

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF ISSUES PRESENTED ...................................................1

APPLICABLE STANDARD OF REVIEW ...................................................3

PRELIMINARY STATEMENT............................................................4

FACTUAL BACKGROUND ..............................................................6

      A.    Debtors' Representations Concerning the Value
             of the Shared Collateral and Inducement of 2023 Noteholders
             to Accept the Plan........................................................6

      B.    Debtors Admit They
             Do Not Know the Value of the Shared Collateral .............................11

      C.    Debtors Are Distinct
             Legal Entities with Separate Books and Records .............................12

      D.    The Unconsolidated Debtors
             Are Not Treated Materially Differently .............................14

      E.    Less than One-Third of the Amount
             of the 2023 Notes Voted to Accept the Plan .......................15

      F.    The Bankruptcy Court Improperly Approves the Plan .......................15

ARGUMENT .......................................................................16

      I.    THE BANKRUPTCY COURT ERRED IN HOLDING
             that the SHARED COLLATERAL HAS no RESIDUAL VALUE................16

A.   The Bankruptcy Court Erred in
Holding that Creditors Have the Burden
to Establish the Value of the Shared Collateral ......................16

B.   The Bankruptcy Court Erred in
Holding that the Shared Collateral Has No Residual Value.....21

II.   THE BANKRUPTCY COURT ERRED IN FINDING
THAT THE PLAN'S SUBSTANTIVE CONSOLIDATION WAS PROPER .........24

III.   THE BANKRUPTCY COURT ERRED IN FINDING THAT
(I) 11 U.S.C. § 1129(B) DOES NOT APPLY AND (II) IN ANY
EVENT, THAT THE PLAN SATISFIES THE ABSOLUTE PRIORITY RULE.....27

A.   11 U.S.C. § 1129(b) Applies....................................................27

B.   The Plan Violates the Absolute
Priority Rule under 11 U.S.C. § 1129(b) ..................................28

CONCLUSION ...............................................................................................30

CERTIFICATE OF COMPLIANCE ...................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACC Bondholder Group v. Adelphia Communs. Corp. (In re Adelphia
    Communs. Corp.)*, 361 B.R. 337 (S.D.N.Y. 2007) ...........................20, 24, 26

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
    634 F.3d 79 (2d Cir. 2011) ..........................................................................29

*In re Adelphia Communs. Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...................................................20, 25

*In re Anderson*,
    884 F.3d 382 (2d Cir. 2018) ..........................................................................3

*In re Augie/Restivo Baking Co.*,
    860 F.2d 515 (2d Cir. 1988) ...................................................................24, 26

*In re Boston Generating, LLC*,
    440 B.R. 302 (Bankr. S.D.N.Y. 2010) ................................................. 22-23

*In re Extended Stay, Inc.*,
    No. 09-13764-JLG, Adv. Pro. No. 11-02254-JLG,
    2020 Bankr. LEXIS 2128
    (Bankr. S.D.N.Y. Aug. 8, 2020) ..................................................................25

*In re Hassan*,
    No. Case No. 14-73711-reg, 2015 Bankr. LEXIS 3419
    (Bankr. E.D.N.Y. Oct. 8, 2015) ...................................................................18

*In re Heritage Highgate, Inc.*,
    679 F.3d 132 (3d Cir. 2012) ............................................................. 4, 17-19

*In re Leonard*,
    151 B.R. 639 (N.D.N.Y. Oct. 30, 1992) .....................................................21

*In re Maddox*,
    200 B.R. 546 (D.N.J. 1996) ..........................................................................3

*In re Pod*,
560 B.R. 77 (Bankr. E.D.N.Y. 2016) ..........................................................17

*In re Ricci-Breen*,
No. 14-22798 (RDD), 2015 Bankr. LEXIS 2909
(Bankr. S.D.N.Y. Aug. 31, 2015) ...............................................................17

*In re Sneijder*,
407 B.R. 46 (Bankr. S.D.N.Y. 2009) ..........................................................16

*In re Southmark Storage Assocs. Ltd. P'ship*,
130 B.R. 9 (Bankr. D. Conn. 1991) ............................................................18

*In re Walsh*,
No. 20-73145-reg, 2021 Bankr. LEXIS 2443
(Bankr. E.D.N.Y. Sept. 3, 2021)..................................................................17

*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*
373 B.R. 283 (S.D.N.Y. 2007) ....................................................................21

*U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge,
LLC*,
138 S. Ct. 960 (2018) .....................................................................................3

## Statutes

11 U.S.C. § 506(a). ....................................................................3, 9, 17, 22

11 U.S.C. § 105 ...........................................................................26

11 U.S.C. § 1129(b) ............................................................... 2, 27-28

28 U.S.C. § 158(a)(1)..................................................................1

## Rules and Regulations

Fed. R. Bankr. P. 8019 ...............................................................1

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Rule 8019 of the Federal Rules of Bankruptcy Procedure, Creditors Udi Baruch Guindi, David Baruch, Soshana Baruch, Habib Mann, Golan LP and Isaak Baruch (collectively, "Appellants" or "Creditors"), by their counsel, Oved & Oved LLP, respectfully request oral argument on this appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from a final order entered by the bankruptcy court on November 2, 2021 (the "Order"), confirming Debtors' Avianca Holdings S.A., et al. ("Debtors") Further Modified Joint Chapter 11 Plan (as amended or modified in accordance with its terms, the "Plan"). Creditors timely filed notices of appeal on November 16, 2021. Dkt. 2349.[1] This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES PRESENTED

1. Did the bankruptcy court err in (1) placing the burden of proof to establish the value of collateral on Creditors, where Debtors represented in their disclosure statement that the value of the subject collateral was insufficient to satisfy Creditors' claims and promised a greater recovery if Creditors' class voted to accept the Plan to induce such creditors to refrain from objecting; and (2)

---

[1] References to "Dkt." refer to the electronic docket entries in In re Avianca Holdings S.A, et al; Case No. 20-11133(MG) venued in the United States Bankruptcy Court Southern District of New York.

ultimately finding that Creditors' collateral had zero value relying solely on Debtors' inability to obtain sufficient equity investments and debt refinancing?

Answer:   Yes.

2.   Did the bankruptcy court err in finding that the Plan's substantive consolidation of Debtors' distinct legal entities with separate books and records was proper, where Debtors failed to identify any individual Debtor's assets and liabilities or how they are being distributed pursuant to the Plan and structured consolidation to spare the assets of the Debtors' three most financially sound entities, whose financials are not more or less entangled with Debtors than those entities the Plan seeks to consolidate?

Answer:   Yes.

3.   Did the bankruptcy court err in finding that the Plan did not violate the absolute priority rule under 11 U.S.C. § 1129(b) although less than one-third of the amount of notes comprising Creditors' impaired class accepted the Plan while the general unsecured creditors of certain of Debtors obtained a full, unimpaired recovery with their equityholders fully unimpaired, while Creditors are forced to accept a 99% loss on their claims?

Answer:   Yes.

## APPLICABLE STANDARD OF REVIEW

The standard of review for a bankruptcy court's legal determinations is *de novo*, and the standard of review for a bankruptcy court's findings of fact is clear error. *In re Anderson*, 884 F.3d 382, 387 (2d Cir. 2018). "Mixed questions are not all alike … [W]hen applying the law involves developing auxiliary legal principles of use in other cases – appellate courts should typically review a decision *de novo*." *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018). Even with primarily factual questions, "an appellate court must correct any legal error infecting a bankruptcy court's decision." *U.S. Bank N.A. ex rel. CWCapital Asset Mgmt. LLC*, 138 S. Ct. at 968 n.7.

In this appeal, all the questions concern either pure questions of law or at the least mixed questions of law and fact in which the legal issues predominate. The questions involve interpretation and application of the Bankruptcy Code, including which party should bear the initial burden of proving the value of collateral under 11 U.S.C. § 506(a) and the appropriate standard by which to value collateral. *See In re Maddox*, 200 B.R. 546, 549 (D.N.J. 1996) (the appropriate standard by which to measure the value of collateral under § 506(a) is an issue of law which is reviewed *de novo*).

## PRELIMINARY STATEMENT

The bankruptcy court erred in confirming the debtors' plan of reorganization because the debtors failed to meet their burden to demonstrate that the value of the collateral securing the notes held by Creditors was insufficient such that Creditors' notes became "effectively unsecured" and also failed to demonstrate that substantive consolidation of 37 of the 40 debtor entities was appropriate.  As a result of the bankruptcy court's errors, it confirmed the Plan, which provides preferential and disparate treatment to creditors whose rights and interests are either equal or subordinate to the rights and interests of Creditors.

The bankruptcy court first erred by placing the burden of proof of the value of the collateral securing the notes on Creditors.  Indeed, the bankruptcy court purported to rely on the Third Circuit's decision in *In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012), as precedent to place the burden on Creditors, but the Third Circuit reached the exact opposite conclusion, holding that, at a minimum, the debtors had the initial burden to demonstrate the insufficiency of the value of collateral.  Moreover, Debtors relied on the purported lack of value of the collateral in the Disclosure Statement, and a promise of an enhanced 40% recovery if Creditors' class voted to approve the Plan, to induce noteholders like Creditors to refrain from objecting to the Plan.  Despite relying on the status of the notes as purportedly unsecured to stifle dissent to the Plan, Debtors failed to provide any

probative evidence that such collateral was, in fact, insufficient to satisfy the notes. Indeed, Debtors' CEO testified that he "believed" that the value of the collateral was insufficient, but admitted that he did not know the actual value of the collateral and that it was not appraised.  Debtors, instead, try to rely on failed attempts to obtain equity financing and a successful raise of an additional $160 million in debt as evidence of the value of the collateral.  As Debtors' CEO admitted, however, equity investors look to long-term profitability and other factors that have nothing to do with the present market value of the assets securing the notes.  Moreover, it is self-evident that a <u>successful</u> debt raise in an amount <u>exceeding</u> the outstanding amounts due under the notes is not evidence of a lack of value of the collateral.

The bankruptcy court next erred in confirming the Plan, which is entirely premised upon the substantive consolidation of 37 of the 40 Debtor entities.  The bankruptcy court ignored that the record evidence demonstrated that Debtors maintain separate books and records, observe corporate formalities, have distinct officers, individually own certain assets, document and record intercompany transfers and loans, and document their separate liabilities.  While substantive consolidation may be convenient, the Second Circuit Court of Appeals has made clear that mere convenience is insufficient, and Debtors failed to meet their burden.

Finally, the bankruptcy court erred in holding that Debtors were not required to show that the Plan did not violate the absolute priority rule and that it was fair

and equitable.  The bankruptcy court ignored, however, that less than one-third of the amount of the notes in Creditors' class voted to accept the Plan.  The Plan provides that certain general unsecured creditors and equityholders will not only be fully unimpaired, but will receive accrued dividends, while secured creditors, like Creditors, will receive a mere penny on the dollar.  As such, the Plan is fatally flawed and the bankruptcy court's approval of the Plan should be reversed.

## FACTUAL BACKGROUND

**A.** **Debtors' Representations Concerning the Value of the Shared Collateral and Inducement of 2023 Noteholders to Accept the Plan**

By petitions filed on May 10, 2020 and September 21, 2020, Debtors filed for relief under Chapter 11 of the Bankruptcy Code.  *See* Dkt. 2300  p. 138 ¶ 1. Prior to filing this proceeding, Debtor Avianca Holdings S.A. ("AVH") issued 9% senior secured notes ("the 2023 Notes") in the aggregate principal amount of $484,419,000.  Dkt. 2138 p. 26.  The 2023 Notes are secured by liens on aircrafts owned by Debtors along with certain of Debtors' intellectual property rights.  *Id.* Creditors are holders of the 2023 Notes with an aggregate principal amount of $8,250,000.  Dkt. 2241-1 ¶¶ 2-5; Dkt. 2241-2 ¶¶ 2-4; Dkt. 2241-3 ¶¶ 2-3.

Prior to the commencement of this proceeding, United Airlines, Inc. and an affiliate of Kingsland Holdings Limited funded $250 million in convertible secured loans to Debtors (the "Stakeholder Loans").  Dkt. 2138 pp. 28-29.  The Stakeholder Loans were secured by AVH's equity interest in AVH's subsidiary, LifeMiles Ltd.

Notably, AVH had the discretion to force the mandatory conversion of the Stakeholder Loans into equity. *Id.* Despite barreling into insolvency, AVH apparently decided not to exercise its rights to wipe out $250 million of debt by converting the Stakeholder Loans into equity. Also prior to the commencement of this proceeding, Debtors issued certain senior secured convertible notes in the aggregate principal amount of $50 million to an investment vehicle managed by Citadel Advisors LLC (the "Citadel Notes"). The Citadel Notes were secured by AVH's equity interests in certain of AVH's subsidiaries. *Id.* p. 29.

To allow Debtors to continue to operate their business during this proceeding, Debtors sought to obtain a postpetition credit facility in the aggregate principal amount of up to approximately $1,922,191,000. Dkt. 1031. To induce certain lenders (the "DIP Lenders") to provide a credit facility to Debtors, including Aero Transporte de Carga Union, S.A. de C.V (N/A) ("Aerounion"), Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A) ("Avifreight"), and Servicios Aeroportuarios Integrados SAI S.A.S. ("SAI," collectively with Aerounion and Avifreight, the "Unconsolidated Debtors"), Wilmington Savings Fund Society FSB, as Indenture Trustee (the "Indenture Trustee"), and others entered into a Collateral Sharing Agreement, dated as of November 1, 2019, as amended. *Id.* p. 7. The Collateral Sharing Agreement purports to give the Indenture Trustee sole authority to act with respect to the "Shared Collateral" as defined in the Collateral

Sharing Agreement, which includes all of the collateral securing the 2023 Notes. *Id.* Creditors and certain other 2023 Noteholders did not consent to the sharing of the collateral securing the 2023 Notes. As further inducement to the DIP Lenders to provide postpetition financing to all Debtors, the collateral securing the Stakeholder Loans and the Citadel Notes was granted to UMB Bank, N.A. (the "Stakeholder Facility Agent"). *Id.* pp. 8-9.

The Order (i) Authorizing Debtors to (a) Obtain Postpetition Financing, and (b) Grant Liens and Superpriority Administrative Expense Claims, (ii) Modifying the Automatic Stay, and (iii) Granting Related Relief (the "Final DIP Order") provided for the priming of all liens securing the 2023 Notes, the Stakeholder Loans and the Citadel Notes to enable Debtors to obtain postpetition financing from the DIP Lenders. Dkt. 1031 pp. 10-11, 21-24.

Debtors now claim that "no value with respect to the Shared Collateral will be available to satisfy 2023 Notes Claims after DIP Facility Claims are satisfied, thereby rendering the 2023 Notes … effectively unsecured." Dkt. 2209 p. 39. According to the Plan, Creditors and other 2023 Noteholders would be made part of "Class 11 - General Unsecured Avianca Claims," which claims are impaired and expected to recover only 1.0-1.4% of their claims. *Id.*; Dkt. 2138 p. 5. Indeed, the solicitation version of Debtors' Disclosure Statement for Joint Chapter 11 Plan of

Avianca Holdings S.A. and Its Affiliated Debtors (the "Disclosure Statement") advised creditors entitled to vote on the Plan, including 2023 Noteholders, that:

> The DIP Facility is secured, in part, by the same collateral securing the 2023 Notes (the "Shared Collateral"); however, pursuant to the Final DIP Order, DIP Facility Claims shall be satisfied first from proceeds of the Shared Collateral (the "DIP Marshaling Provision"). As a result of the DIP Roll-Up and the DIP Marshaling Provision, ***no value with respect to the Shared Collateral will be available to satisfy 2023 Notes Claims after DIP Facility Claims are satisfied, thereby rendering the 2023 Notes, as well as any other indebtedness secured by the Shared Collateral on equal footing with the 2023 Notes, effectively unsecured*** pursuant to section 506(a) of the Bankruptcy Code.

Dkt. 2138 pp. 46-47, n.14 (emphasis added).

In other words, Debtors represented to the 2023 Noteholders that the collateral securing the 2023 Notes prior to this bankruptcy proceeding presently had no value available to satisfy claims under the 2023 Notes. The Disclosure Statement further advised 2023 Noteholders that their claims would be made part of "Class 11 - General Unsecured Avianca Claims," which claims are impaired and expected to recover only 1.0% of the amount of their claims. *Id.* pp. 5, 46-47.

However, the Disclosure Statement further advised 2023 Noteholders that "**if Class 11 votes to __accept__ the Plan**, in addition to the treatment set forth above, each holder of an Allowed General Unsecured Avianca Claim will also receive its Pro Rata Share of either (x) the Unsecured Claimholder Enhanced Cash Pool or (y) if such holder duly elects to receive the Unsecured Claimholder Equity

Packages, the Unsecured Claimholder Enhanced Equity Pool." *Id.* p. 47 (emphasis in original). Thus, after representing to 2023 Noteholders that there was no value in their collateral to satisfy any part of their claims and they were now unsecured, the Disclosure Statement attempted to induce 2023 Noteholders to vote to accept a plan that they might otherwise have rejected by increasing their allowed recovery as unsecured creditors.

Moreover, despite getting the benefits of the use of the collateral securing the 2023 Notes through postpetition financing along with the other Debtors, according to the Plan, the Unconsolidated Debtors (Classes 12, 13, 14), and the equityholders of Avifreight and SAI (Classes 20, 21) would remain entirely unimpaired. Dkt. 2138 pp. 40-43.

Finally, the Plan provides for the substantive consolidation of the assets of Debtors to create a single common pool of assets to pay off creditors. *Id.* pp. 55-56. The Unconsolidated Debtors and their assets, however, are not part of the substantive consolidation. The Plan fails to explain why the assets of the Unconsolidated Debtors are excepted from this consolidation or how it is equitable to allow the unsecured creditors of the Unconsolidated Debtors to receive unimpaired, full recoveries, while Creditors are left with a 1.0%-1.4% recovery.

**B.**     **Debtors Admit They Do Not Know the Value of the Shared Collateral**

In his declaration, Adrian Neuhauser ("Neuhauser"), Chief Executive Officer of Aviana Holdings S.A. and other unidentified Debtors, stated that he "believe[d] that the amount of the DIP Facility Claims exceed[ed] the value of the Shared Collateral."   Dkt. 2263.  ¶ 11.   Upon cross-examination, however, Neuhauser admitted that Debtors did not know the value of the Shared Collateral and could not even offer an approximate amount of the value.  Dkt. 2370 111:20-23.  Indeed, Neuhauser did not even know the number of airplanes that constituted the Shared Collateral.  *Id.* 116:17-19.  Rather, Neuhauser's direct testimony was that Debtors assumed the amount of the DIP Facility Claims exceeded the value of the Shared Collateral because they were unsuccessful in soliciting equity investments in Debtors.  Dkt. 2263 ¶ 11.

Neuhauser, however, admitted that potential equity investors would look primarily to future potential earnings of Debtors in determining whether to make an investment.  Dkt. 2370 113:20-114:25.  Moreover, Neuhauser admitted that the ongoing COVID-19 pandemic had decimated demand for the air travel services offered by Debtors and that potential equity investors may have relied on their perception of demand destruction for such services.  *Id.*  Neuhauser also acknowledged that investors make investments to achieve some sort of internal rate of return, and their reluctance to make an equity investment could simply reflect

that they did not believe such a rate of return was possible, despite believing that an equity investment could generate a positive return.  *Id.* 115:20-116:2.

On cross-examination, Neuhauser sought to supplement his direct testimony by stating that Debtors also sought to refinance the DIP financing and successfully obtained an approximate $160 million in additional debt financing through that process.  *Id.* 112:8-21; 123:13-21.  As such, Debtors' quest to solicit additional equity investments and successful attempt to obtain an additional $160 million in refinanced debt are not determinative of the value of the Shared Collateral and do not demonstrate the present value of the Shared Collateral in any amount, and certainly not in an amount that is less than the amount of the DIP Facility Claims.

**C.**     **Debtors Are Distinct Legal Entities with Separate Books and Records**

The Disclosure Statement provides that the Plan is premised on the substantive consolidation of the Avianca Debtors.[2] Dkt. 2138 p. 64 of 261.  Ginger Hughes ("Hughes"), a Managing Director and Partner of Seabury International Corporate Finance LLC and Seabury Securities LLC (collectively, "Seabury"), which has acted as Debtors' investment banker and financial advisor in connection with a potential restructuring, testified that the Avianca Debtors:

---

[2] The "Avianca Debtors" means all of Debtors except Aero Transporte de Carga Union, S.A. de C.V (N/A) ("Aerounion"), Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A) ("Avifreight"), and Servicios Aeroportuarios Integrados SAI S.A.S. ("SAI," and collectively with Aerounion and Avifreight, the "Unconsolidated Debtors").

i. maintain separate books and records, including maintaining journals and sub-journals for the transactions of each of the Avianca Debtors;

ii. properly document and record intercompany transactions, including intercompany payables, receivables, and loans;

iii. observe corporate formalities;

iv. comply with unique local governance and regulatory requirements;

v. each has officers,[3] in addition to other locally required corporate governance positions;

vi. separately owned certain assets; and

vii. maintain documentation for all liabilities, including loan agreements and guarantees, that specify the liabilities of each relevant Avianca Debtor.

Dkt. 2262. ¶¶ 1, 10.

Hughes testified on cross-examination that the primary reason Debtors seek a substantive consolidation of the Avianca Debtors in the Plan is because of the difficulty in disentangling the finances of the Avianca Debtors. Dkt. 2370 162:19-22. Notably, neither the Disclosure Statement nor the Plan identifies each individual Avianca Debtor's assets and liabilities or how they are being distributed pursuant to the Plan.

---

[3] Neuhauser testified that he was the Chief Executive Officer of only certain, but not all of Debtors. Dkt. 2370 107:22-108:25. Thus, Debtors do not all share corporate officers.

**D.      The Unconsolidated Debtors Are Not Treated Materially Differently**

In her declaration, Hughes testified that the "separate corporate existence of many of the Avianca Debtors was driven primarily by local regulatory requirements." Dkt. 2262 ¶ 18.   At the same time, however, in claiming that Avifreight should not be part of the substantively consolidated Avianca Debtors, Hughes admits that "Avifreight was established **with the sole purpose of complying with local [Mexican] regulations**." *Id.* ¶ 26 (emphasis added).

Hughes further testified that the Avianca Debtors own between 90-92% of the Unconsolidated Debtors. *Id.* ¶ 27.   The Disclosure Statement shows that the Unconsolidated Debtors, *i.e.*, Avifreight, Aerounion and SAI, are all indirectly owned by Avianca Holdings S.A., which also directly or indirectly owns the Avianca Debtors. Dkt. 2148, Ex. B, p. 243 of 261.   Thus, the Avianca Debtors and the Unconsolidated Debtors all have common ownership.   Hughes testified in response to cross-examination that the assets and liabilities of the Unconsolidated Debtors are part of Debtors' consolidated financial statements. Dkt. 2370 130:6-15; 131:9-12; *see also* 110:3-6.   Moreover, the Financial Projections for the Reorganized Debtors,[4] annexed to the Disclosure Statement, included future

---

[4]  The Disclosure Statement states that the "'Reorganized Debtors' means, collectively, (i) Reorganized AVH [Avianca Holdings S.A.], (ii) each Debtor other than AVH as Reorganized pursuant to this Plan, and (iii) the direct and indirect subsidiaries of Reorganized AVH, or any successors thereto, by merger,

financial projections "on a consolidated basis" for all Debtors, including the Unconsolidated Debtors, thus, demonstrating that the Unconsolidated Debtors' financials are not more or less entangled with the Avianca Debtors than those entities the Plan seeks to substantively consolidate. Dkt. 2138, Ex. D, pp. 250-58. Because the Plan spares the Unconsolidated Debtors from substantive consolidation, the Unconsolidated Debtors' equityholders remain entirely unimpaired and receive payment of accrued dividends. Dkt. 2259, pp. 32, 46-47.

**E.      Less than One-Third of the Amount of the 2023 Notes Accepted the Plan**

The Disclosure Statement states that approximately $129.9 million in principal of the 2023 Notes remains presently outstanding. Dkt. 2138 p. 27 of 261. The Certification of P. Joseph Morrow IV with respect to the Tabulation of Votes on the Joint Chapter 11 Plan of Avianca Holdings S.A. and its Affiliated Debtors sets forth that only $41,760,000 worth of 2023 Notes voted to accept the Plan. Dkt. 2239 p. 9.  Thus, less than one-third of the amount of the 2023 Notes entitled to vote on the Plan voted to accept the Plan.

**F.      The Bankruptcy Court Improperly Approves the Plan**

---

consolidation, or otherwise, in each case on or after the Effective Date." Dkt. 2138 p. 169 of 261.  The Plan provides that it "constitutes a separate chapter 11 plan of reorganization for the Avianca Debtors and each Unconsolidated Debtors."  *Id.* p. 181 of 261.  Thus, the Unconsolidated Debtors are being reorganized.

Following an October 26, 2021 confirmation hearing, by Order entered November 2, 2021, the bankruptcy court confirmed the Plan, improperly holding (i) that Creditors had the burden of demonstrating the value of the Shared Collateral, but finding Debtors' irrelevant evidence somehow demonstrated the lack of value; (ii) substantive consolidation was appropriate; and (iii) the Plan did not violate the absolute priority rule.  *See generally* Dkt. 2300  pp. 138-192.  In so holding, the bankruptcy court made several critical errors set forth below that require reversal.

## ARGUMENT

## I.

## THE BANKRUPTCY COURT ERRED IN HOLDING
## THAT THE SHARED COLLATERAL HAS NO RESIDUAL VALUE

**A.     The Bankruptcy Court Erred in Holding that Creditors
Have the Burden to Establish the Value of the Shared Collateral**

The bankruptcy court erred in holding that Creditors had the burden of demonstrating that the value of the Shared Collateral was less than the amount of the DIP Facility Claims such that there was no value available to satisfy any part of the 2023 Notes claims.  In so doing, the bankruptcy court cited to its own prior decision in *In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009), which held that Chapter 13 creditors had the burden of proof of establishing both the extent of the lien and the value of the collateral.  *See* Dkt. 2300 p. 153 ¶ 37.  In the 11 years

since *In re Sneijder* was decided, however, the growing consensus is that debtors bear the burden of proof.

While the Second Circuit Court of Appeals has not addressed this issue, in 2012, the Third Circuit Court of Appeals held that, at a minimum, "the debtor bears the initial burden of proof to overcome the presumed validity and amount of the creditor's secured claim." *In re Heritage Highgate, Inc.*, 679 F3d at 139-40 ("We now hold that a burden-shifting framework controls valuations of collateral to decide the extent to which claims are secured pursuant to § 506(a)"). Indeed, the Third Circuit Court of Appeals held that it "is only fair, then, that the party seeking to negate the presumptively valid amount of a secured claim – and thereby affect the rights of a creditor – bear the initial burden." *Id.* at 140.

Following *In re Heritage Highgate*, most district courts in this circuit adopted the approach that the debtor bears the initial burden before it shifts to the creditor. *See e.g.*, *In re Pod*, 560 B.R. 77, 80, 2016 Bankr. LEXIS 3822, *80 (Bankr. E.D.N.Y. 2016) ("This and other courts have found that the initial burden of establishing a secured claim's value is on the debtor") (citing *In re Heritage Highgate, Inc.*, 679 F.3d at 140); *In re Walsh*, 2021 Bankr. LEXIS 2443, *4-5 (Bankr. E.D.N.Y. Sept. 3, 2021) ("The initial burden of establishing the value of the real property in this context is on the debtor") (citing *In re Heritage Highgate, Inc.*, 679 F.3d at 140); *In re Ricci-Breen*, 2015 Bankr. LEXIS 2909, *5 (Bankr.

S.D.N.Y. Aug. 31, 2015) (debtors bear the initial burden of overcoming any presumption that the value of the property stated in creditors' proof of claim is the correct value); *In re Hassan*, 2015 Bankr. LEXIS 3419, *13 (Bankr. E.D.N.Y. Oct. 8, 2015) ("[t]he initial burden of proof remains on the Debtors"); *see also In re Southmark Storage Assocs. Ltd. P'ship*, 130 B.R. 9, 10 (Bankr. D. Conn. 1991) ("The [Chapter 11] debtor bears the initial burden of overcoming the presumption that the amount of Prime Plus' secured claim is as stated in its proof of claim").

The bankruptcy court not only ignored this, but entirely misconstrued the holding of *In re Heritage Highgate* by claiming that the Third Circuit Court of Appeals held that the creditor "bears the ultimate burden." Dkt. 2300 ¶ 37. To the contrary, the Court expressly held that it became the creditor's burden ***only if*** the debtor first met its burden in demonstrating that the value of the collateral was insufficient to satisfy a secured claim:

> If the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value, the burden shifts. The creditor **thereafter** bears "the ultimate burden of persuasion … to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim."

*In re Heritage Highgate*, 679 F3d at 140 (emphasis added).

Here, the bankruptcy court placed the entire burden of valuing the Shared Collateral on Creditors, thereby disregarding the Third Circuit's holding and the

overwhelming consensus in the Second Circuit that debtors bear the initial burden. Given this error, the bankruptcy court's decision should be reversed.

Alternatively, even if the Court disagrees that Debtors bear the initial burden as a matter of law, here, the circumstances dictate that Debtors bear the burden of demonstrating the value of the Shared Collateral as it relates to the amount of the DIP Facility Claim.  *See In re Heritage Highgate, Inc.*, 679 F.3d at 140 ("The circumstances will dictate the assignment of the burden of proof on the question of value").  Placing the burden on Debtors is warranted because they engaged in an active campaign to silence dissent and opposition to the Plan by offering the 2023 Noteholders increased recovery for their votes and representing that there was no other avenue for recovery.

As set forth above, the Disclosure Statement represented to the 2023 Noteholders that there was no value in the collateral available to satisfy any part of the 2023 Notes claims and, as such, they were "effectively unsecured."  The Disclosure Statement also offered the 2023 Noteholders a greater recovery in exchange for voting to confirm the Plan.  Thus, a large number of 2023 Noteholders likely relied on Debtors' representation that the value of the collateral securing the 2023 Notes was insufficient to satisfy the notes in deciding to vote to accept the Plan in exchange for an increased recovery, rather than expend legal fees objecting to the Plan given that Debtors represented there was no other avenue for recovery.

This Court has directly warned against this exact scenario.   In *ACC Bondholder Group v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.)*, 361 B.R. 337, 363 (S.D.N.Y. 2007), the Court specifically expressed concerns regarding a situation "[w]here the receipt of valuable benefits in a plan is conditioned on a vote to accept that plan" because these circumstances create "a very real possibility of dissuading or silencing opposition to the plan".   *Id.* at 363. ("Such an inducement may well have led some claimants to approve the Plan when they otherwise may have rejected it.   As a result, creditors opposing the Plan may have been prejudiced by a quid pro quo exchange of Plan approval for valuable releases and exculpations.").

In these specific circumstances, where Debtors used their (i) conclusory and unsupported representations that the value of the Shared Collateral was less than the amount of the DIP Facility Claims and (ii) promise of a greater recovery if the class voted to accept the Plan to induce 2023 Noteholders to refrain from objecting, the bankruptcy court should have found that Debtors bear the burden to prove that their representation regarding the Shared Collateral's value in the Disclosure Statement was, in fact, accurate and true.   Given the bankruptcy court's failure to do so, its decision should be reversed.

**B.      The Bankruptcy Court Erred in Holding
         <u>that the Shared Collateral Has No Residual Value</u>**

The bankruptcy court improperly found that Debtors' quest to obtain equity

investments and refinancing capital constituted "a robust market test" sufficient to

discern the value of the Shared Collateral.   <u>Dkt. 2300</u> p. 153 ¶ 38.  Here, Debtors

did not conduct a proper market test concerning the value of the Shared Collateral,

but rather sought an equity investment and debt refinancing that, by their nature,

cannot determine the value of the Shared Collateral.  A market test derives a fair

market valuation of the collateral based upon <u>data from recently sold comparable</u>

<u>properties</u> by comparing them with the subject collateral on a point-by-point basis

and  making  necessary  adjustments  to  account  for  all  significant  differences

between them.  *In re Leonard*, <u>151 B.R. 639</u>, 642, 1992 Bankr. LEXIS 2238, *5,

n.1 (N.D.N.Y. Oct. 30, 1992); *see also Iridium IP LLC v. Motorola, Inc. (In re*

*Iridium Operating LLC)*, <u>373 B.R. 283</u>, 337 (S.D.N.Y. 2007) (accepting a debtor's

valuation methodology comprised of "market approach, which included looking at

guideline companies and comparables, Indium's public stock price, debt offerings,

and contemporaneous valuations").

Here, Debtors did not utilize either the market approach or any other

accepted appraisal techniques to value the Shared Collateral.  Rather, Neuhauser

simply stated that he "believe[d] that the amount of the DIP Facility Claims

exceed[ed] the value of the Shared Collateral."   <u>Dkt. 2263</u> ¶ 11.  Upon cross-

examination, however, Neuhauser admitted that Debtors did not know the value of the Shared Collateral and could not even offer an approximate amount of the value. During Neuhauser's direct testimony, he explained that Debtors assumed the amount of the DIP Facility Claims exceeded the value of the Shared Collateral because they were unsuccessful in obtaining sufficient equity investments and refinancing capital.   Nevertheless, Neuhauser, admitted that potential equity investors would look primarily to future potential earnings of Debtors in determining whether to make an investment.   Moreover, Neuhauser admitted that the ongoing COVID-19 pandemic had decimated demand for the air travel services offered by Debtors and that potential equity investors may have relied on their perception of demand destruction for such services.   Neuhauser also acknowledged that investors make investments to achieve some sort of internal rate of return, and their reluctance to make an equity investment could simply reflect that they did not believe such a rate of return was possible, despite believing that an equity investment could generate a positive return.

In labeling Debtors' solicitation of equity investments and debt refinancing "a robust market test," the bankruptcy court cited to two cases that do not support a proposition that such solicitation is sufficient to establish value of collateral under 11 U.S.C. § 506(a).   *See* Dkt. 2300 p. 153 ¶ 38 (citing *In re Boston Generating, LLC*, 440 B.R. 302, 324 (Bankr. S.D.N.Y. 2010) and *In re Chemtura Corp.*, 439

B.R. 561, 573 (Bankr. S.D.N.Y. 2010)).   In *In re Boston*, the court granted the debtors' motion to approve the sale of substantially all assets instead of pursuing confirmation of a Chapter 11 plan in part because "several data points indicate[d] the potential value of their assets," among them the "highest and best offer" of $1.1 billion to purchase those exact assets.   *Id.*, 440 B.R. at 310-313.   In *In re Chemtura Corp.*, the court considered the valuation of the "total enterprise value" of a group of debtors – not the value of specific assets.   *Id.*, 439 B.R. at 567-68.   Moreover, the court did not hold that debtors' inability to solicit sufficient investments, alone, demonstrated that the debtors' total enterprise value did not exceed the value underlying the settlement.   Rather, the court relied on the three standard valuation methodologies implemented by the debtors: discounted cash flow, comparable companies, and precedent comparable transactions.   *Id.* at 573.   Thus, neither of the cases relied on by the bankruptcy court supports the proposition that Debtors' failed attempt to find additional equity investments or Debtors' success in obtaining an additional $160 million of debt financing through a refinance somehow demonstrate the value of the specific assets that comprise the Shared Collateral.

In sum, Debtors' quest to solicit additional equity investments and successful attempt to obtain an additional $160 million in refinanced debt are not determinative of the value of the Shared Collateral and do not demonstrate the present value of the Shared Collateral in any amount, and certainly not in an amount

that is less than the amount of the DIP Facility Claims.  Given that the bankruptcy court found no residual value in the Shared Collateral relying solely on Debtors' inability to obtain sufficient investments and refinancing capital, the bankruptcy court's decision should be reversed.

**II**

**THE BANKRUPTCY COURT ERRED IN FINDING
THAT THE PLAN'S SUBSTANTIVE CONSOLIDATION IS PROPER**

Contrary to the bankruptcy court's erroneous findings, Debtors had not met their burden of establishing that the substantive consolidation of 37 of the 40 Debtors was proper.  Substantive consolidation "has the effect of consolidating the assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets held by, a single entity."  *ACC Bondholder Group*, 361 B.R. at 359.   The "sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors."  *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).  "Because of the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor, we have stressed that *substantive consolidation is no mere instrument of procedural convenience* … but a measure vitally affecting substantive rights to be used sparingly."  *Id.* (emphasis added) (internal citations and quotations omitted).   "Substantive consolidation should be used only after it has been determined that all creditors will

benefit because untangling is either impossible or so costly as to consume the assets." *Id.* at 519.

Courts consider the following factors in determining whether to approve substantive consolidation:

- The presence or absence of consolidated financial statements;

- The unity of interest and ownership among various corporate entities;

- The degree of difficulty in segregating and ascertaining individual assets and liabilities;

- The transfers of assets without formal observance of corporate formalities;

- The commingling of assets and business functions;

- The profitability of consolidation at a single physical location; and

- The disregard of legal formalities.

*In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, *139-40 (Bankr. S.D.N.Y. Aug. 8, 2020).

Here, many of these factors simply do not exist.  The Avianca Debtors maintain separate books and records, observe corporate formalities, each complies with varying local requirements, each has officers and many have distinct officers, individually own certain assets, document and record intercompany transfers and loans, and document their separate liabilities.  *See In re Adelphia Communs. Corp.*, 368 B.R. 140, 218 (Bankr. S.D.N.Y. 2007) ("the Second Circuit made clear that

entanglement of related debtors' affairs was by itself insufficient to warrant substantive consolidation").

Moreover, Debtors have failed to identify each individual Debtor's assets and liabilities, how they were being distributed, and how that ensures that all creditors receive equitable treatment, especially given that the 2023 Noteholders, supposedly, no longer can look to their collateral to satisfy their claims. *See ACC Bondholders Group*, 361 B.R. at 360 (holding substantial possibility that the Bankruptcy Court improperly confirmed a plan where "[n]either the Plan nor the Confirmation Order identifies each individual Debtor's assets and liabilities and how they are being distributed pursuant to the Plan").

Additionally, the Plan's Substantive Consolidation is inequitable because Debtors deliberately except the three most financially sound Debtors from substantive consolidation and deprive creditors like the 2023 Noteholders of meaningful avenues of recovery. *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518, n.1 (the power to consolidate derives from the bankruptcy court's general equitable powers as set forth in 11 U.S.C. § 105). Exclusion of the Unconsolidated Debtors is unwarranted because they are not materially different from the Avianca Debtors. Indeed, they all share common ownership, certain of the Avianca Debtors are entitled to dividends or distributions from the Unconsolidated Debtors, the assets and liabilities of the Unconsolidated Debtors are part of Debtors'

consolidated financial statements, and the Unconsolidated Debtors were included in the future financial projections for Debtors that were submitted with the Disclosure Statement.    Clearly, excepting the Unconsolidated Debtors from substantive consolidation is a deliberate tactic to spare the assets of the Unconsolidated Debtors from satisfying the claims of the 2023 Noteholders.

As such, the Plan's Substantive Consolidation is not warranted, and, therefore, the bankruptcy court's decision approving the Plan should be reversed.

### III

### THE BANKRUPTCY COURT ERRED IN FINDING THAT (i) 11 U.S.C. § 1129(b) DOES NOT APPLY AND (ii) IN ANY EVENT, THAT THE PLAN SATISFIES THE ABSOLUTE PRIORITY RULE

#### A.    11 U.S.C. § 1129(b) Applies

The bankruptcy court erred in finding that the absolute priority rule under 11 U.S.C. § 1129(b) did not apply to the 2023 Noteholders.  The absolute priority rule must always be satisfied "with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.C.S. § 1129(b).

Here, the 2023 Notes are certainly impaired and less than one-third of the holders of the amount of the 2023 Notes permitted to vote on the Plan voted to accept it.  Pursuant to the Disclosure Statement, approximately $129.9 million in principal of the 2023 Notes remains presently outstanding.  Dkt. 2138 p. 27 of 261.  However, only $41,760,000 worth of 2023 Notes voted to accept the Plan.  Dkt.

2239 p. 9.  As such, less than one-third of the impaired 2023 Notes accepted the Plan, and the Plan must satisfy the absolute priority rule as to the 2023 Noteholders.

The bankruptcy court's reasoning – that the absolute priority rule does not apply because the majority of the Unsecured Avianca Claims voted to accept the Plan – is erroneous because it places the 2023 Notes into the pool with the Unsecured Avianca Claims.  To be clear, contrary to the bankruptcy court's assertion (*see* Dkt. 2300  p. 151 ¶ 34), Creditors do not collaterally attack the Final DIP Order that simply provides that the DIP Facility Claims should be satisfied before the 2023 Notes claims.  *See* Dkt. 1031 pp. 46-48 ¶ 28.  Rather, Creditors contest the bankruptcy court's unsupported finding that the Shared Collateral has no value available to satisfy claims arising from the 2023 Notes.  This erroneous finding, not the Final DIP Order, rendered the 2023 Notes unsecured.  Given that the bankruptcy court's finding that the 2023 Notes are unsecured is an error, the court's conclusion – that the absolute priority rule under 11 U.S.C. § 1129(b) does not apply with respect to the 2023 Notes because the majority of the Unsecured Avianca Claims voted to accept the Plan – is also erroneous.

**B.     The Plan Violates the
         Absolute Priority Rule under 11 U.S.C. § 1129(b)**

The Plan violates the absolute priority rule under 11 U.S.C. § 1129(b) because the Plan provides the general unsecured creditors of the Unconsolidated

Debtors with a full, unimpaired recovery and leaves their equityholders fully unimpaired, while Creditors receive literally a penny on the dollar.

The Bankruptcy Code requires that the Plan conform to the absolute priority rule, which "requires that, if a class of senior claim-holders will not receive the full value of their claims under the plan and the class does not accept the plan, no junior claim- or interest-holder may receive 'any property' 'under the plan on account of such junior claim or interest.'" *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 86 (2d Cir. 2011). It has been long recognized that all creditors are "entitled to be paid before the stockholders could retain [shares] for any purpose whatever." *In re DBSD N. Am., Inc.*, 634 F.3d at 94 (modification in original). A plan "would not be fair and equitable which … admitted the stockholders to participation, unless at very least the stockholders made a fresh contribution in money or in money's worth in return for a participation reasonably equivalent to their contribution." *Id.* (internal quotation marks omitted). In *In re DBSD B. Am., Inc.*, the Second Circuit explained that because "Sprint gets less than half the value of its claim", [t]he plan may be confirmed, therefore, only if the existing shareholder, whose interest is junior to Sprint's, does 'not receive or retain' 'any property' 'under the plan on account of such junior … interest." *Id.* at 86. Because "the existing shareholder did receive

property under the plan on account of its interest," the Second Circuit held that "the bankruptcy court therefore should not have confirmed the plan." *Id.* at 87.

The same is true here. Creditors would receive 1.0%-1.4%, while the equityholders of the Unconsolidated Debtors are completely unimpaired and fully retain their shares in the entities post-bankruptcy. By sparing the Unconsolidated Debtors and their assets from substantive consolidation, the Plan provides that the general unsecured creditors and equityholders of the Unconsolidated Debtors will not only be unimpaired, but they will receive accrued dividends, while Creditors receive next to nothing. Thus, the Plan violates the absolute priority rule by providing a full recovery to the Unconsolidated Debtors' equityholders, who are junior to Creditors. Given that the Plan plainly violates the absolute priority rule, the bankruptcy court's decision approving the Plan should be reversed.

## **CONCLUSION**

For the foregoing reasons, Appellants respectfully requests that the Court reverse the bankruptcy court's Order confirming the Plan.

Dated: New York, New York
November 30, 2021

/s/ Glen Lenihan
Glen Lenihan, Esq.
OVED & OVED LLP
*Attorneys for Appellants*
401 Greenwich Street
New York, NY 10013
Tel: 212.226.2376
glenihan@ovedlaw.com

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) as the brief contains 6,803 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  November 30, 2021

By:  /s/ Glen Lenihan, Esq.
       Glen Lenihan, Esq.