UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                           :

In re                          :

                           :        Case No. 20-11133 (MG)

AVIANCA HOLDINGS S.A., *et al.*,   :        Chapter 11

                           :        Jointly Administered

              Debtors.    :

                           :
-----------------------------------------------------------X
                           :

UDI BARUCH GUINDI, SOSHANA   :
BARUCH, HABIB MANN, GOLAN LP, and :
ISAAK BARUCH,                :

                           :

             Appellants,  :

                           :        21-CV-10118 (VSB)

       - against -        :

                           :       **OPINION & ORDER**

AVIANCA HOLDINGS S.A. *et al.*,    :

                           :

             Appellees.   :

                           :
-----------------------------------------------------------X

<u>Appearances</u>:

Glen Bernard Lenihan
Jonathan Austin Lynn
Oved & Oved LLP
New York, NY
*Counsel for Appellants*

Benjamin Max Schak
Dennis F. Dunne
Evan R. Fleck
Erin E. Dexter
Millbank LLP
New York, NY and Washington, DC
*Counsel for Appellees*

<u>VERNON S. BRODERICK</u>, United States District Judge:

       This bankruptcy appeal arises out of the objections to the joint Chapter 11 plan of

reorganization for the Debtors[1] approved by the bankruptcy court (the "Plan").  Appellants,[2] holders of notes issued prior to the initiation of Chapter 11 proceedings, argue that the bankruptcy court erred in finding that a pool of available collateral was insufficient to leave them with secured claims, and that the bankruptcy court erred in how it allowed for substantive consolidation of certain Debtors.  They also argue that these errors led to a further error in how the voting to accept the Plan was calculated.  Because I find no reversible error in any of these areas, the bankruptcy court's rejection of Appellants' objections is AFFIRMED.  Debtors' motion to dismiss this appeal as equitably moot is thus DENIED as moot.

## I.    Factual Background[3]

### A.    The 2023 Notes and Their Rights to the Shared Collateral

Debtor Avianca Holdings S.A. ("AVH," and collectively with all Debtors, "Avianca") is the parent holding company of a large airline group in Latin America.  (A-151.[4])  On May 10,

---

[1] The Debtors in the underlying Chapter 11 bankruptcy action, and each Debtor's federal tax identification number (to the extent applicable), are as follows:  Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Loyalty Bermuda Ltd. (N/A); AV Taca International Holdco S.A. (N/A); Aviacorp Enterprises S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaragüense de Aviación, Sociedad Anónima (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aereo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A). The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.  (A-14.)

[2] Appellants are Udi Baruch Guindi, David Baruch, Soshana Baruch, Habib Mann, Golan LP, and Isaak Baruch.

[3] The facts in this section are recited only to provide background information for this decision and are not intended to be, and should not be viewed as, findings of fact.

[4] "A-__" refers to pages in Appellants' Appendix.  (Docs. 17-1–17-5.)

2020, in the wake of the COVID-19 pandemic, Avianca—which comprises 40 Debtors—filed the underlying Chapter 11 bankruptcy cases.  (A-151–52.)

Prior to filing for bankruptcy, AVH issued the "2023 Notes," which are 9% senior secured notes in the total principal amount of $484,419,000.  (A-154; A-531.)  The 2023 Notes were secured with interests in a pool of assets owned by various of the Debtors known as the "Shared Collateral," and the 2023 Noteholders' interests were to be represented by the "2023 Notes Indenture Trustee."  (A-158; A-444–48.)  Because the Shared Collateral secured the interests of others in addition to the interests of the 2023 Noteholders, all 2023 Noteholders were party to a "Collateral Sharing Agreement" dated November 1, 2019, which delineated the relative rights of all parties with interest in the Shared Collateral.  (A-158.)  Appellants are holders of the 2023 Notes in the total amount of $8,250,000.  (A-2549.)

In order to raise money needed to run its business during the Chapter 11 cases, Avianca negotiated and reached agreement with a group of 2023 Noteholders ("Agreement 2023 Noteholders").  The Agreement 2023 Noteholders arranged for the 2023 Notes Indenture Trustee to allow other liens to take seniority over the liens giving 2023 Noteholders rights to the Shared Collateral, and they agreed to provide last-resort security for at least $200 million of new debtor-in-possession ("DIP") loans known as the "Tranche A DIP Loans."  (A-152; AA-9–10.[5])

On October 5, 2020, the bankruptcy court entered an order approving all of Avianca's DIP financing (the "Final DIP Order").  (A-439.)  In addition to the Tranche A DIP Loans, the Final DIP Order also approved a "convertible 'Tranche B' facility secured by the same pool of collateral" (the "Tranche B DIP Loans," and together with the Tranche A DIP Loans, the "DIP Tranches").  (A-541; A-440.)  The Tranche B DIP Loans gave Debtors the right, at their option,

---

[5] "AA-__" refers to pages in Appellees' Appendix.  (Docs. 24-1–24-4.)

to convert the Tranche B DIP Loans into equity in what was to become AVH's successor entity. (A-161; A-2445.)  Specifically, according to the terms governing Avianca's exit from bankruptcy, Avianca had to either repay both DIP Tranches, or it had to repay the Tranche A DIP Loans; if it did not have enough money left to pay the Tranche B DIP Loans "in full in cash," it had to exercise the conversion option and provide the holders of Tranche B DIP Loans with equity in AVH's successor.  (A-2443–44; A-162–63 ("To emerge from Chapter 11, the Debtors must either (i) Pay the Tranche B DIP Facility Claims in full in cash . . . or (ii) equitize the Tranche B DIP Facility Claims pursuant to the terms set forth in the Final DIP Order.").)

The Final DIP Order granted liens to the DIP collateral agent, who was responsible to all DIP lenders, on all of the "DIP Collateral" as defined in the Final DIP Order.  (A-159; A-459–61 (defining "DIP Collateral").)  Notably, this grant included liens on the Shared Collateral that were senior to the liens securing the 2023 Notes.  (A-159.)  The Final DIP Order also has a marshalling provision.  This provision states that any "DIP Facility Claims"—which includes the DIP Tranches, (*see* A-61, 63)—must "be satisfied first from proceeds of the Shared Collateral and second from proceeds of other DIP Collateral (whether or not an event of default or exercise of remedies has occurred)."  (A-484 ¶ 28; A-159 ¶ 16.)  In other words, the "DIP Facility Claims" had to be "satisfied from the Shared Collateral before the DIP Facility Claims [could] look to any other collateral."  (A-160.)  No appeals or motions for relief from the Final DIP Order were filed.  (A-152.)

Once the Final DIP Order was entered, all 2023 Noteholders received a notice dated August 20, 2020 (the "Bondholder Roll-Up Notice").  (AA-634–36; A-152–53.)  The Bondholder Roll-Up Notice informed 2023 Noteholders that, due the priming of the liens on the Shared Collateral securing the 2023 Notes, DIP Facility Claims were entitled "to be repaid from

the proceeds of the 2023 Notes Collateral on account of any other claims that are secured by the

2023 Notes Collateral, including the [2023] Notes." (AA-635.) The Bondholder Roll-Up Notice

also told 2023 Noteholders that they could convert their 2023 Notes into Tranche A DIP Loans at

a ratio of $1000:$200 if they invested no new money, or at a ratio of $1000:$340 if they elected

to invest new money to fund their pro rata share of the amount that the 2023 Notes Indenture

Trustee agreed to provide as security. (*Id.*) Holders of around 75% of the 2023 Notes

participated and converted their 2023 Notes to Tranche A DIP Loans. (A-153.) Appellants

chose not to participate in this roll-up. (A-161.) As a result of the bankruptcy court's orders, the

2023 Noteholders' interests in the Shared Collateral were junior to over $2,510,000,000 of DIP

Facilities Claims. (A-160 ¶ 20.) Of this, there were over $1,600,000,000's worth of Tranche A

DIP Loans and over $910,000,000 of Tranche B DIP Loans. (*Id.*; A-441.)

Attempting to solicit additional investments towards refinancing "either or both of the

[DIP Tranches,]" the Debtors conducted a marketing process from April through June of 2021

(the "Marketing Process"). (A-161 ¶ 25.) This involved, among other things, contacting an

initial 125 parties, of which "over 35 accessed a virtual data room containing comprehensive

information on the Debtors' business plan, cash flow projections, and other pertinent materials."

(A-964; A-162 ¶ 26 (bankruptcy court order describing the process as "rigorous and

comprehensive.").) However, the Marketing Process "did not result in an offer to fund debt

and/or equity investments in amounts sufficient to repay the Tranche A and Tranche B DIP

Facility Claims." (A-162 ¶ 27.) As a result, the bankruptcy court concluded that the value of the

Shared Collateral—which itself was greater than the value of "all of the Debtors' assets"—was

worth "less than the amount of outstanding DIP Facility Claims." (A-164 ¶ 31.)

B.    *The Joint Chapter 11 Plan*

Under the joint Chapter 11 plan of reorganization approved by the bankruptcy court (the "Plan"), 37 of the Debtors were substantively consolidated for the purposes of the Plan (the "Consolidated Debtors").  (A-101–02; A-154–55 n.5 (listing each Consolidated Debtor); A-173–88.)  This had the effect of treating all Consolidated Debtors' "assets and . . . liabilities . . . as though they were merged."  (A-101.)  The Plan also provided for the Chapter 11 reorganization of three other Debtors (the "Unconsolidated Debtors").  (A-88; A-79–80 (naming the three Debtors who make up the Unconsolidated Debtors).)  The bankruptcy court proceedings involved various record evidence that the bankruptcy court determined supported a finding that the Unconsolidated Debtors should not be substantively consolidated with the Consolidated Debtors.  (*See, e.g.*, A-349:4–7 (bankruptcy court colloquy with witness in which witness affirms that "the three unconsolidated debtors" are not "managed or governed by those same people" as the people who manage the Consolidated Debtors); A-349:12–350:3 (testimony that "unconsolidated debtors maintain their own books and records.").)

In light of the Marketing Process, the Plan classified 2023 Noteholders' claims into "Class 11," which also included other general unsecured claims against the Consolidated Debtors.  (A-69, A-94.)  The former 2023 Noteholders which had converted their 2023 Notes to Tranche A DIP Loans were excluded from this definition.  (A-58.)  The Plan provides that people with Class 11 claims are to receive their pro rata share of either a pool of $30 million in cash or a pool of equity, depending on the sort of claim held.  (A-94; *see also* A-80 (defining the relevant pools).)

The Plan was approved by the bankruptcy court on November 2, 2021.  (A-50.)  As part of the approval process, holders of claims in Class 11 and some other classes were entitled to

vote whether to accept the Plan.  (A-698–99.)  The weight of each vote corresponded to the

dollar amount of the underlying claim.  (*Id*.)  Each of the voting Classes approved the Plan at

rates between 87.18% and 100% of the dollar amounts of the claims.  (A-781.)  Within Class 11,

98.96% of the overall claims approved the Plan.  (*Id*.)  Holders of the 2023 Notes—a subset of

Class 11—voted to approve the plan at a rate of 77.49% of the dollar amount of the claims.  (*Id*.)

Appellants objected to the Plan before the bankruptcy court's October 26, 2021

confirmation hearing. [6]  (A-156–57 ¶ 9.)

## II.    <u>Opinion Below</u>

On November 2, 2021, along with approving the Plan, the bankruptcy court entered an

order that rejected Appellants' objections (the "Underlying Order").  (A-151; A-199.)  Three

portions of the Underlying Order are relevant to this appeal.  First, the bankruptcy court found

that Appellants, as holders of 2023 Notes, were properly sorted into Class 11 under the Plan,

because their interest in the Shared Collateral was zero once more senior claims were paid, as

demonstrated by the Marketing Process's failure to solicit further investments into the Debtors.

(A-158–68.)  The court also found that the Appellants did not provide

> any evidence to suggest that the value of the of the Shared Collateral exceeds the
> amount of the Tranche A DIP Facility Claims, much less the Tranche A DIP
> Facility Claims and the Tranche B Facility Claims.  Furthermore, even if . . . the
> Debtors bore the burden of proof on this question, the Debtors have proven by a
> preponderance of the evidence that the interest of the holders of 2023 Notes Claims
> in the Shared Collateral has no value.

(A-167 ¶ 40 (emphasis omitted).)

---

[6] After Avianca resolved a handful of other objections, only one other objection remained for the bankruptcy court
to resolve at the hearing.  The bankruptcy court overruled that objection, the objectors appealed to this Court, and
the parties eventually stipulated to a voluntary dismissal.  *See In Re: Avianca Holdings S.A.*, 21-cv-10004-AJN
(S.D.N.Y.)

Second, the bankruptcy court determined that the vote tabulation on the Plan did not violate section 1129(b) of the Bankruptcy Code, 11 U.S.C. § 1129(b), and that arguments regarding the "absolute priority rule" and the "fair and equitable" test were inapplicable because Class 11, of which Appellants were part, voted overwhelmingly to approve the Plan. (A-169–71.)

Third, the bankruptcy court rejected Appellants' argument that substantive consolidation of the Consolidated Debtors was inappropriate. (A-173.) The bankruptcy court reviewed record evidence that supported allowing the substantive consolidation of the Consolidated Debtors and explained why Second Circuit law allows for substantive consolidation on these facts. (A-174–88.)

### III.    <u>Procedural History</u>

Appellants filed their notice of appeal on November 29, 2021. (Doc. 1.) On December 17, 2021, then-District Judge Nathan, to whom this action was originally assigned, entered a briefing schedule for the parties' briefs regarding the appeal as well as for briefs on an anticipated motion to dismiss the appeal. (Doc. 10.)

Avianca filed a motion to dismiss the appeal as equitably moot on January 4, 2022. (Doc. 13.) On January 25, 2022, Appellants filed their brief in opposition to Avianca's motion to dismiss the appeal. (Doc. 18.) On February 1, 2022, Avianca filed a reply brief on the motion to dismiss the appeal. (Doc. 22.)

On January 19, 2022, Appellants filed their brief on appeal and their appendix. (Doc. 17.) On February 28, 2022, Avianca filed its brief on appeal and its own appendix. (Doc. 24.) On March 16, 2022, Appellants filed their reply brief on appeal. (Doc. 27.) On April 6, 2022, this action was reassigned to me.

## IV.    Standard of Review

A district court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) "to hear appeals" from "final judgments, orders, and decrees" of a bankruptcy court.  I review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo.  *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).  A bankruptcy court's discretionary decisions are reviewed for abuse of discretion.  *See, e.g.*, *In re Boodrow*, 126 F.3d 43, 47 (2d Cir. 1997).  A bankruptcy court's "rulings on the credibility of witnesses . . . are [also] reviewed under an abuse of discretion standard."  *In re CBI Holding Co.*, 419 B.R. 553, 563 (S.D.N.Y. 2009) (citing *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006), and *BIC Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 38–39 (2d Cir. 2001) (summary order)).

In reviewing a decision of a bankruptcy court, the district court may affirm on any ground supported by the record.  *Freeman v. J. Reg. Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010).  The district court may not consider evidence outside the record.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 339 (S.D.N.Y. 2008).  Arguments not raised below are forfeited and may only be considered to avoid manifest injustice*.  See In re Barquet Grp., Inc.*, 486 B.R. 68, 73 n.3 (S.D.N.Y. 2012) (citing *In re Enron Corp.*, 419 F.3d 115, 126 (2d Cir. 2005)); *In re Lionel Corp.*, 29 F.3d 88, 92 (2d Cir. 1994).

## V.    Discussion

Appellants' challenge to the Underlying Order is driven by the economic reality that, although the face value of their 2023 Notes is approximately $8.25 million, the Plan allows them to recover only about 1% of that. (*See* Opening Br. at 2 (asserting that Appellants were "forced to accept a 99% loss on their claims"); *id.* at 8 (emphasizing that Appellants, as members of "Class 11," were "expected to recover only 1.0–1.14% of their claims."); *id.* at 30 ("Creditors

would receive 1.0%-1.4%, while the equityholders of the Unconsolidated Debtors are completely unimpaired and fully retain their shares in the entities post-bankruptcy.").[7])  This recovery follows from the finding below that the Shared Collateral was not worth enough to leave Appellants as secured creditors.

Appellants challenge three aspects of the decision of the bankruptcy court.  They assert that the bankruptcy court erred:  (1) with regard to the Shared Collateral, (a) by placing the burden of proof on them, rather than on Debtors, to establish the value of the Shared Collateral, and (b) by finding that the Shared Collateral had so little value to render Appellants general unsecured creditors; (2) in allowing substantive consolidation of the Consolidated Debtors while sparing the Unconsolidated Debtors, which are three of Avianca's "most financially sound entities;" and (3) in tabulating the vote that found Appellants' class accepted the Plan despite "the absolute priority rule under 11 U.S.C. § 1129(b)."  (*See id.* 1–2.)

In an attempt to avoid appellate review entirely, Avianca filed a motion to dismiss Appellants' appeal as equitably moot.  (Doc. 13.)  Equitable mootness is a prudential doctrine under which a court may dismiss a bankruptcy appeal "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable."  *See Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 143 (2d Cir. 2005) (internal quotation marks omitted); *see also Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 949–50 (2d Cir. 1993).  The doctrine is deployed in a "pragmatic" and flexible fashion and must be responsive to the "specific factors presented in a particular case."  *Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*, 772 F.3d 102, 107–08 (2d Cir. 2014) (internal quotation marks omitted).  Because of its pragmatic roots, "equitable

---

[7] "Opening Br." Refers to Appellants' opening brief on appeal.  (Doc. 17.)

mootness applies to specific claims, not entire appeals and must be applied with a scalpel rather than an axe." *R² Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 482–83 (2d Cir. 2012) (cleaned up). "[A] court is not inhibited from considering the merits before considering equitable mootness," and indeed, "[o]ften, an appraisal of the merits is essential to the framing of an equitable remedy." *In re Metromedia*, 416 F.3d at 144.

Here, I find it necessary to develop a full understanding of the merits of this appeal in order to assess how equitable mootness may apply to limit or bar the remedy Appellants seek. Therefore, I first address each of the merits issues Appellants raise.

### A.    *The Valuation of the Shared Collateral*

Appellants argue that the bankruptcy court erred in two ways in its valuation of the Shared Collateral. First, Appellants assert that the bankruptcy court erred in its assignment of the burden of proof in establishing the correct valuation. Second, Appellants submit that regardless of the burden of proof, the bankruptcy court's ultimate valuation was clear error. I address these challenges in turn.

### 1.   **Burden of Proof**

With regard to secured claims in a bankruptcy, Section 506(a) of the Bankruptcy Code provides that:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.

11 U.S.C. § 506(a).

"The burden of proving valuation falls on different parties at different times." *In re Sears Holdings Corp.*, 621 B.R. 563, 571 (S.D.N.Y. 2020) (quoting *In re Residential Cap., LLC*, 501

B.R. 549, 590 (Bankr. S.D.N.Y. 2013)). "Neither the Code nor the Federal Rules of Bankruptcy Procedure allocates the burden of proof as to the value of secured claims under § 506(a). In the absence of explicit direction, courts have arrived at divergent formulations." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012). In *Heritage Highgate*, the Third Circuit held that a "burden-shifting approach" was the "most appropriate in the . . . scenario" it faced. *Id.* at 140. Under the *Heritage Highgate* approach, "[t]he initial burden should be on the party challenging a secured claim's value," with the burden shifting "[i]f the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the collateral is of insufficient value." *Id.* "The creditor thereafter bears the ultimate burden of persuasion to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim." *Id.* (internal quotation marks and alterations omitted).

Appellants claim that the bankruptcy court erred in "holding" that creditors, rather than debtors, had the burden of proof to establish the value of the Shared Collateral. (Opening Br. at 16.) Although the parties have not identified, nor have I found, controlling Second Circuit precedent squarely addressing this issue, Appellants argue that the bankruptcy court's approach conflicts with *Highland Heritage.* This argument misconstrues the record before the bankruptcy court and its findings. The Underlying Order indicates that, regardless of who bore the initial burden, the bankruptcy court's factual findings would be the same. Specifically, the Underlying Order found that, "under the framework of *In re Heritage Highgate,*" Appellants "ha[d] not adduced ***any*** evidence to suggest that the value of the Shared Collateral" was sufficient to leave them with secured claims, and that "even if . . . the Debtors bore the burden of proof on this question, the Debtors have proven by a preponderance of the evidence that the interest of the holders of 2023 Notes Claims in the Shared Collateral has no value." (A-167 ¶ 40.) In other

words, the bankruptcy court found that Avianca was the only party to produce any evidence to

carry a burden of proof.  I therefore find no error in the bankruptcy court's allocation of the

burden of proof.

### 2. The Bankruptcy Court's Valuation Findings Related to the Shared Collateral

Next, Appellants challenge the bankruptcy court's finding related to the valuation of the

Shared Collateral.  In general, "factual determinations, such as the values assigned to assets, are

reviewed only for clear error."  *Nestle Holdings, Inc. v. Comm'r of Internal Rev. Serv.*, 152 F.3d

83, 86 (2d Cir. 1998); *see In re Kerwin*, 996 F.2d 552, 560 (2d Cir. 1993) ("No one disputes that

the bankruptcy court's valuation comprises a finding of fact subject to review under the clearly

erroneous standard." (citing Fed. R. Bankr. P. 8013)).  Here, Appellants "attempt[] to convert the

bankruptcy court's factual finding as to . . . value, to which a clearly erroneous standard of

review applies, into legal error" by arguing that the bankruptcy court's valuation finding required

certain features absent from the Marketing Process.  *In re LightSquared, Inc.*, 534 B.R. 522, 534

(S.D.N.Y. 2015), *aff'd sub nom. Ahuja v. LightSquared Inc.*, 644 F. App'x 24 (2d Cir. 2016).

(*See* Opening Br. 21–24.)  However, Appellants do not identify any law suggesting that any

particular feature is necessary before a "market test" can be deemed a "proper" measure of value.

(*Id.*)  Rather, Appellants' argument boils down to an argument about the sufficiency of the

evidence.  They contend that their counsel's "cross-examination" of an Avianca witness

demonstrates that Avianca "did not know the value of the Shared Collateral," (*id.* at 21–22), and

that the Marketing Process was not necessarily "determinative of the value of the Shared

Collateral," (*id.* at 23).

My assessment is limited to a review for clear error, and I see no clear error in the

bankruptcy court's determination that the Marketing Process demonstrated that "the interest of

the 2023 Notes Claims in the Shared Collateral is zero." (A-167 ¶ 39.) Indeed, the bankruptcy

court's conclusion makes sense, because the Marketing Process involved "contact[ing] over 125

potentially interested parties", many of whom "were already familiar with the Debtors'

business," to solicit further investments, and, although "over 35 [parties] accessed a virtual data

room," none of them chose to invest in Avianca. (A-162 ¶¶ 26–27.) Further, the Marketing

Process aligns with the tenet, recognized by the Supreme Court, that "the best way to determine

value is exposure to a market." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,

526 U.S. 434, 457 (1999). In simple terms, the Marketing Process demonstrated that no entity

wished to purchase or invest in Debtors or Debtors' assets for any amount of money. Thus, it

stands to reason that Debtors' assets had no market value. Since the Shared Collateral is a part

of Debtors' assets, it follows that the Shared Collateral also had no market value. It was

therefore reasonable for the bankruptcy court to find that Avianca's total assets were not worth

more than the claims already outstanding against them, which includes the DIP Tranches with

priority over the 2023 Notes. I find no clear error in the bankruptcy court's approach or findings.

Appellants argue for the first time on reply that the various issues it identified in its

opening brief are reversible clear error. (Reply Br. 8–9.[8]) However, the evidence they cite from

the record does not stand for what they say it does. For example, Appellants argue that witness

testimony that the DIP Facility Claims exceeded the value of the Shared Collateral should not be

credited because the witness "admitted that Debtors did not know the value of the Shared

Collateral and could not even offer an approximate amount of the value." (Opening Br. 11;

Reply Br. 9.) Appellants misconstrue the testimony. In fact, the transcript Appellants cite

demonstrates that the Debtors valued the Shared Collateral at "less than what the DIP facility is

---

[8] "Reply Br." refers to the Reply Brief for Appellants. (Doc. 27.)

worth." (A-320:23–24.) Appellants' counsel asked the witness, "What is the value of the shared collateral today?" (A-320:20). The witness responded, "We haven't appraised it." (A-320:21.) When asked if he could give "an approximate number," he said "[p]robably not, but it's less than what the DIP facility is worth, because as we stated in our document, we were unable to raise financing to that amount." (A-320:22–25.) Elsewhere in the record, the Debtors' witness answered Appellants' counsel's question about whether he "believe[d] that [he] c[ould] state with certainty that the value of the DIP facility -- the amount of DIP facility claims exceeds the value of the shared collateral" in the affirmative—by saying "I do." (A-326:23–27:2.) A single witnesses' inability to put a precise number value on an asset pool on a given day does not mean that Debtors never knew the value of the Shared Collateral, and they certainly knew after the Marketing Process that the Shared Collateral was worth far less than the claims against the Debtors.

I note further that, for all the deficiencies Appellants claim to have identified regarding the Plan valuation of the Shared Collateral, at no stage of the proceedings have Appellants put forward affirmative evidence to support an alternative valuation based on an alternative valuation method. Rather, Appellants merely suggest alternative valuation methods such as "discounted cash flow, comparable companies, and precedent comparable transactions." (Opening Br. at 23 (citation omitted); *see also* A-304.) Nowhere in the record have Appellants submitted the amount that these alternative methods might value the Shared Collateral. Nor have they proffered a valuation expert. In other words, Appellants have never identified what they believe the value of the Shared Collateral might be, much less that it is greater than the value of the DIP Facility Claims.[9]

---

[9] Appellants' failure to make any effort to value the Shared Collateral might even be read to suggest that such a

In sum, I find that the bankruptcy court's factual findings of the value of the Shared Collateral are not clear error, and that Appellants have not demonstrated any error in the allocation below of the burden of proof.

### B.    *Substantive Consolidation*

Appellants next challenge the bankruptcy court's substantive consolidation of 37 of the 40 Debtors.  I find Appellants' arguments unavailing, as the bankruptcy court correctly found that, unlike the 3 Unconsolidated Debtors, the affairs of the 37 Consolidated Debtors were hopelessly entangled such that they warranted consolidation.

"The substantive consolidation of estates in bankruptcy effects the combination of the assets and the liabilities of distinct, bankrupt entities and their treatment as if they belonged to a single entity." *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 58 (2d Cir. 1992).  "Substantive consolidation usually results in, *inter alia*, pooling the assets of, and claims against, the [] entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the [] companies for purposes of voting on reorganization plans." *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).  In *Augie/Restivo*, the Second Circuit explained that substantive consolidation may be justified after considering a number of factors, including the following:

- The presence or absence of consolidated financial statements;
- The unity of interest and ownership among various corporate entities;
- The degree of difficulty in segregating and ascertaining individual assets and liabilities;
- The transfers of assets without formal observance of corporate formalities;
- The commingling of assets and business functions;
- The profitability of consolidation at a single physical location;
- The disregard of legal formalities.

---

valuation would not have been helpful to their argument.  However, I need not and do not make such a finding here.

*In re Worldcom, Inc.*, No. 02–13533, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing, *inter alia*, *Augie/Restivo*, 860 F.3d at 518).  However, these factors are "merely variants on two critical" and overarching "factors:  (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Augie/Restivo*, 860 F.3d at 518 (internal citations and quotation marks omitted).  "The satisfaction of either prong will support a request for substantive consolidation."  *In re Extended Stay, Inc.*, No. 09-13764, 2020 WL 10762310, at *42 (Bankr. S.D.N.Y. Aug. 8, 2020); *In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 248 (S.D.N.Y. 1996) ("Conceivably, substantive consolidation could be warranted on either ground; the Second Circuit's use of the conjunction 'or' suggests that the two cited factors are alternatively sufficient criteria.").[10]  A bankruptcy court's "*Augie/Restivo* factual findings" are reviewed for "clear error," and its "appl[ication of] law to those facts" is reviewed de novo.  *In re Republic Airways Holdings Inc.*, 582 B.R. 278, 284 (S.D.N.Y. 2018).

Appellants raise two challenges to substantive consolidation.  The first essentially relates to the sufficiency of the evidence considered by the bankruptcy court.  (*See* Opening Br. 25 ("many of the[] factors" set forth *supra* note 7 "simply do not exist" on the face of the record).)  Second, they argue that if substantive consolidation is allowed at all, then the Unconsolidated

---

[10] Appellants' argument that "many of the [*Augie/Restivo*] factors simply do not exist" with respect to Debtors is misplaced, because the more extensive listing of factors in that case represent variations on the two broad factors discussed in *Extended Stay*.  (Opening Br. at 25.)  Further, Appellants' citation to *In re Adelphia Communs. Corp.*, (Opening Br. at 26–27), for the proposition that "the Second Circuit made clear that entanglement of related debtors' affairs was by itself insufficient to warrant substantive consolidation" is misleading.  368 B.R. 140, 218 (Bankr. S.D.N.Y. 2007).  The court there went on to explain that "substantive consolidation should be granted" when the affairs are either so entangled that "untangling is either impossible or so costly as to consume the assets, or where no accurate identification and allocation of assets is possible."  *Id*.  In other words, *Adelphia* simply restated the uncontroversial principle that hopeless entanglement on its own may be sufficient to support substantive consolidation.  It was not erroneous for the bankruptcy court to rely on that principle here.

Debtors should be included in the consolidation.  (Opening Br. 26.)  Further on this point, they argue that excluding the Unconsolidated Debtors from consolidation is inequitable for creditors because they were "the three most financially sound Debtors."  (Opening Br. 26.)  In other words, Appellants believe that their exclusion "deprive[s] creditors like the 2023 Noteholders of meaningful avenues of recovery."  (*Id.*)

Substantive consolidation may be proper where the "entanglement of debtors' affairs" and "a commingling of [multiple] firms' assets and business functions" are so great that "untangling is either impossible or so costly as to consume the assets" of the firms. *Augie/Restivo*, 860 F.2d at 519.  Here, the bankruptcy court, after considering the evidence presented, found that the Debtors "operate as a single economic unity; share the same back-office functions . . . ; share numerous employees, officers, debtors, and shareholders; share significant overlaps in the creditors pools . . . ; share a headquarters; and utilize a centralized cash management system." [11]  (A-186.)  The court therefore concluded, based on expert testimony, that "untangling" the Consolidated Debtors "would be extremely difficult, expensive, and time-consuming."  (A-186–87; *see also, e.g.*, A-369:16–20 (testimony from Debtors' financial advisor that disentangling Consolidated Debtors' "books and records . . .  would take millions of dollars and 20 years to accomplish"); A-370:14–A-371:7 (same witness explaining that valuing the assets shared among all Consolidated Debtors, such as "spare parts" for airplanes, and figuring out to which Consolidated Debtor it should be attributed would be "a very complicated, long, drawn-out exercise").)  This record thus supports the inference that the Consolidated Debtors were entangled in a manner such that "no accurate identification and

---

[11] Indeed, although Appellants argue that some other facets of the Consolidated Debtors' operations did not overlap, they do not seem to challenge the bankruptcy court's factual findings underlying its consolidation ruling.  (Opening Br. at 13, 25.)

allocation of assets is possible," at least without consuming considerable resources that otherwise could be used to benefit creditors.  *See Augie/Restivo*, 860 F.2d at 519.

Appellants claim in response to these parts of the record that "Debtors maintain separate books and records, observe corporate formalities, each complies with varying local requirements, each has officers and many have distinct officers, individually own certain assets, document and record intercompany transfers and loans, and document their separate liabilities."  (Opening Br. at 25; *id*. at 13 (citing A-950–53 ¶¶ 1–10).)  In pointing out these features, Appellants seem to suggest that disentangling the Debtors' assets would not be "impossible or so costly as to consume the assets" of the firms.  *Augie/Restivo*, 860 F.2d at 519.  Appellants further protest that "Debtors have failed to identify each individual Debtor's assets and liabilities [and] how they were being distributed."  (Opening Br. at 26.)

These arguments do not withstand scrutiny.  First, the portion of the record Appellants cite—a financial advisor's declaration—does not support their assertions.  The cited paragraphs simply recite the declarant's qualifications and the background of her review of Debtors' operations; they do not describe separate operations with distinct recordkeeping.  *See* A-950–53 ¶¶ 1–10.  Indeed, the declarant later explains that "substantive consolidation of certain Debtors is warranted and should be approved" in part because "the Avianca Debtors' operations are tightly integrated, such that untangling each Avianca Debtor's separate operations would be difficult, time-consuming, and expensive."  A-955.  Second, Appellants offer no expert testimony or other evidence to support a view that the Debtors' operations would be easy, straightforward, or cost-effective to disentangle.  Third, Appellants' observation that Debtors have not presented individualized accountings is consistent with a finding of hopeless disentanglement—if an individualized accounting were possible, there would be less need to substantively consolidate.

It is telling that while Appellants point out that Debtors have not presented individualized accountings, they did not endeavor to do such an accounting themselves. For these reasons, Appellants' counterarguments do not change my conclusion that the bankruptcy court did not err in finding substantive consolidation appropriate.

As for the three Unconsolidated Debtors, record evidence cited by Appellants themselves, (Reply Br. 13), demonstrates that each had their separate "books and records" maintained by "their own accounting staff." (A-349:15–350:3.) By contrast, the Consolidated Debtors' finances were all tracked as part of "a general ledger," with only "an attempt to create [separate] subledgers" for each Consolidated Debtor, despite the fact that they were part of "an enterprise that's completely integrated." (A-351:23–A-352:5.) Reviewing this and other evidence, the bankruptcy court found "no difficulty in disentangling" the Unconsolidated Debtors from the rest of the Debtors. (A-187 ¶ 126.) This ruling is consistent with Second Circuit law that "substantive consolidation should be used only" when "untangling is either impossible or [sufficiently] costly." *See Augie/Restivo*, 860 F.2d at 519. Furthermore, even if it would benefit Appellants to include the Unconsolidated Debtors in the substantive consolidation, Appellants cite no law suggesting that a bankruptcy court can substantively consolidate debtors who can be untangled from the rest just because it may benefit certain creditors, or for that matter all creditors, to lump all debtors together.

### C.    *Tabulation of the Vote on the Plan*

Appellants' final argument is that the bankruptcy court erred in finding that the "the absolute priority rule under 11 U.S.C. § 1129(b) did not apply to the 2023 Noteholders." (Opening Br. 27.) However, Appellants acknowledge that a necessary premise of this argument is that the Shared Collateral has value available to satisfy claims arising from the 2023 Notes

after satisfying the DIP Facility Claims.  (*Id.* at 28; *see also* Reply Br.  9 ("improper valuation of the Shared Collateral also resulted in a violation of the absolute priority rule").)  I have already held *supra* that the bankruptcy court did not commit reversible error in how it valued the Shared Collateral.  This holding controls, and Appellants' absolute priority argument fails.  Indeed, if there is no value left in the Shared Collateral to satisfy the claims of 2023 Noteholders like Appellants, then there is no basis for holding that it was error to find that the "2023 Notes are unsecured," (Opening Br. 28), and thus it is no error to group Appellants with other unsecured creditors for Plan voting purposes.  *See In re 266 Wash. Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y.) ("Generally, unsecured creditors hold substantially similar claims; they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims."), *aff'd sub nom. In re Wash. Assocs.*, 147 B.R. 827 (E.D.N.Y. 1992); *see also In re Carver*, 144 B.R. 643, 646 (S.D.N.Y. 1992) ("To the extent that Chase is undersecured on Carver's personal loan, it holds an unsecured claim against his estate in bankruptcy.").

Further, Appellants agree that 11 U.S.C. § 1129(b)'s absolute priority rule only applies to classes that vote to reject a Chapter 11 plan.  *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 86 (2d Cir. 2011).  Here, holders of claims representing 98.96% of the value of the voting Class 11 claims voted to accept the Plan.  (A-781.)  Since Class 11 did not reject the Plan, the absolute priority rule does not apply.  Even if I assume—without deciding—that Appellants are correct that the bankruptcy court should have placed the 2023 Noteholders in their own class, holders of claims representing 77.49% of the value of the voting 2023 Note claims voted to accept the Plan.[12]  (*Id.*)  Thus, the absolute priority rule would not apply even under Appellants' preferred

---

[12] Appellants argue that "less than one-third of the . . . 2023 Notes accepted the Plan," (Opening Br Br. 28), but their argument misapprehends how voting is calculated.  11 U.S.C. § 1126(c) provides that "[a] class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such

scenario.

### D.    *Equitable Mootness*

I next turn to the issue of equitable mootness.  As an initial matter, granting equitable mootness over the appeal would be applying an "axe" rather than a "scalpel" as the law requires. *See R² Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 482–83 (2d Cir. 2012) (internal quotation marks omitted).  In any event, having considered Appellants argument on the merits and having found no reversible error, Debtors' motion to dismiss is DENIED as moot. *Cf. Holzer v. Barnard*, No. 15-CV-6277, 2016 WL 4046767, at *15 (E.D.N.Y. July 27, 2016) (affirming bankruptcy court rulings and therefore denying motion to equitably dismiss as moot).

### VI.    <u>Conclusion</u>

For the foregoing reasons, the decision of the bankruptcy court is AFFIRMED, and Debtors' motion to dismiss is DENIED as moot.

---

plan."  This statute requires a bankruptcy court to "calculate two fractions" where the denominator is "the value of all claims that vote either way."  *In re DBSD N. Am., Inc.*, 634 F.3d 79, 106 (2d Cir. 2011); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 261 (Bankr. S.D.N.Y. 2007) ("[T]he language of section 1126(c)" requires "that only those actually voting be counted in determining whether a class has met the requirements, in number and amount, for acceptance or rejection of a plan."), *aff'd*, 544 F.3d 420 (2d Cir. 2008).  In other words, § 1126(c) measures acceptance against the total number of creditors and claims in a class that actually vote, whereas Appellants' position considers the total number of claims in a class without regard to whether they vote.  Therefore, Appellants' approach is inconsistent with the law.

The Clerk of Court is respectfully directed to terminate the motion pending at Doc. 25 and to close the case.

SO ORDERED.

Dated: October 3, 2024
    New York, New York

Vernon S. Broderick
United States District Judge